UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| The Estate of Zerihun Wolde, individually and as assignee and Lacks Beach Service, individually and as assignor, | ) ) ) ) | Case No.: |
| Plaintiffs, | ) ) | **COMPLAINT** |
| vs. | ) ) | **(JURY TRIAL REQUESTED)** |
| Arch Specialty Insurance Company, Arch Insurance Company, Arch Insurance Group, Inc. and Brian McMahon, individually, | ) ) ) ) | |
| Defendants. | ) ) | |

## SUMMARY OF THE CASE

Lacks Beach Service ("LBS") is a small family-owned and -operated business which has provided beach services to Myrtle Beach residents and visitors for more than thirty years. Throughout the company's history, it has sought to be a responsible local business by maintaining significant liability insurance in the unfortunate event that any of its patrons are injured during lifeguard hours. Prior to August 24, 2018, LBS paid Arch Specialty Insurance Company $150,918.00 in exchange for Arch's assurances that it would provide professional, general and umbrella liability of $3,000,000 for any claims made against LBS. On November 24, 2018, a father of four on vacation with his family drowned during lifeguard hours while trying to save his daughter from a rip current. On November 1, 2019, the Estate of Zerihun Wolde ("the Estate") initiated a wrongful death suit against LBS stemming from the August 24, 2018, drowning in the Horry County Court of Common Pleas (2019-CP-26-07075) ("*Wolde Claim*"). In exchange for the significant premium paid by LBS, Arch was legally obligated to perform two fundamental duties under the liability policy: the duty to defend and the duty to indemnify LBS with regard to the

*Wolde Claim*. Furthermore, Arch was legally obligated to thoroughly investigate the *Wolde Claim* and to protect LBS from the financial harm posed therein. As will be detailed below, Arch and Brian McMahon—a vice president of Arch Insurance Group, Inc.'s major case unit—failed miserably in complying with their legal obligations and, as a result, the case was tried to verdict in Horry County resulting in a $20,730,000 judgment against LBS.

In addition to the legal debt now owed by LBS, the verdict has caused LBS to suffer irreparable harm and consequential damages, including but not limited to attorney's fees and costs, financial loss, injury to its reputation, lost earnings and risk of insolvency. Because LBS is a small family business, it cannot afford the further financial risk of an appeal or the post-judgment interest which is accruing daily. As a result and in an effort to save itself from insolvency, LBS has assigned to the Estate its claims and causes of action against Arch and its agents, adjusters, third-party adjusters, and affiliated entities for failing to comply with the contractual obligations owed to LBS, failing to act reasonably in the investigation and handling of the claim—including in the defense and settlement of the claim—and failing to comply with its duty of good faith and fair dealing. The Assignment of Claims is attached hereto as Exhibit 1 and incorporated herein.

## THE COMPLAINT

NOW COME THE PLAINTIFFS, the Estate of Zerihun Wolde, individually and as assignee, and Lacks Beach Service, individually and as assignor, complaining of the above-named Defendants, hereby alleging unto this Honorable Court as follows:

## JURISDICTION AND VENUE

1.      The Estate is a judgment creditor and assignee of the claims and causes of action herein alleged by virtue of the verdict rendered in the Horry County Court of Common Pleas and the Assignment of Claims attached hereto as Exhibit 1.  The Estate is a citizen of Maryland pursuant to 28 U.S.C. § 1332(c)(2).

2

2.     LBS is a judgment debtor and assignor of the claims and causes of action herein alleged by virtue of the verdict rendered in the Horry County Court of Common Pleas and the Assignment of Claims attached hereto as Exhibit 1.  LBS is a South Carolina corporation with its principal place of business in Myrtle Beach, South Carolina, and is therefore a citizen of South Carolina.

3.     For the reasons set forth in Exhibit 1, both LBS and the Estate are the real and proper parties in interest to bring this action and hereinafter will be referred to as Plaintiffs unless referred to separately for a specific purpose.

4.     Arch Specialty Insurance Company is an insurance company organized in Missouri which maintains its principal place of business in Missouri.  It is therefore not a citizen of South Carolina.

5.     Arch Insurance Company is an insurance company organized in Missouri which maintains its principal place of business in Missouri, and it is therefore not a citizen of South Carolina.  It is, upon information and belief, a member of an insurance holding company.

6.     Arch Insurance Company is, upon information and belief, the sole owner of Arch Specialty Insurance Company and is a wholly owned subsidiary of Arch Insurance Group, Inc.

7.     Arch Insurance Group, Inc. is an insurance company organized in Delaware which upon information and belief maintains its principal place of business in New Jersey, and it is therefore not a citizen of South Carolina.  It is owned by Arch Capital Group, Ltd., a Bermuda-based publicly-held limited liability company.

8.     Hereinafter, the foregoing Arch for-profit entities are referred to collectively as "Arch."

3

9.      The Arch Defendants are affiliated domestic corporations which operate as one company under the Arch Capital Group, Ltd. umbrella. Arch, by and through its employees, agents, and affiliated entities, is approved to write insurance in the State of South Carolina as well as 48 other states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

10.     In addition to being actively engaged in all facets of the insurance industry within the State of South Carolina, Arch committed numerous tortious acts and/or omissions within the State of South Carolina as detailed herein.

11.     McMahon is a resident of the State of New York and is employed by Arch Insurance Group, Inc. as a vice president of the company's major case unit. Mr. McMahon committed numerous tortious acts and/or omissions within the State of South Carolina related to the *Wolde Claim*.

12.     The allegations and claims asserted herein against Arch stem from the Defendants' negligent, grossly negligent and willful acts and/or omissions related to the investigation, defense of and handling of the claims made against LBS in the *Wolde Claim*.

13.     The allegations and claims asserted herein against Defendant McMahon stem from his negligent, grossly negligent and willful acts and/or omissions including tortious interference with the contractual obligations owed to LBS related to the *Wolde Claim*.

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because complete diversity exists between Plaintiffs and the Defendants, and the amount in controversy exceeds $75,000.

15.     This Court has personal jurisdiction over the Defendants because the Defendants engaged in continuous and systematic activities in South Carolina and purposely availed

4

themselves of the privilege of conducting activities in South Carolina, and this action arises from the Defendants' activities in South Carolina.

16.     Venue is proper in this division pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in Horry County, South Carolina.

## FACTUAL BACKGROUND

17.     The allegations contained in the preceding paragraphs are repeated and realleged as if set forth herein verbatim.

18.     LBS is a small family-run business which has provided beach services to citizens and visitors in Myrtle Beach for more than thirty years. These services have been provided pursuant to a series of franchise agreements with the City of Myrtle Beach.

19.     For more than thirty years LBS has operated as a responsible and prudent small business by carrying significant insurance coverage to protect the business from potential and unforeseen loss.

20.     At all times relevant hereto, LBS was insured by Arch through a contract of insurance bearing policy number FLP0059537-02, which provided professional, general and umbrella liability coverage pursuant to the terms of the contract with liability limits of $3,000,000.

21.     On August 24, 2018, a loss occurred when a father of four young children drowned while saving his daughter from a rip current on a section of the beach where LBS was responsible for swimmers' safety—including lifeguard protection—pursuant to a franchise agreement with the City of Myrtle Beach.

22.     On November 1, 2019, the Estate initiated a wrongful death suit against LBS stemming from the August 24, 2018 drowning in the Horry County Court of Common Pleas (2019-CP-26-07075).

23.     On July 29, 2022, as a direct and proximate result of the Defendants' negligent, grossly negligent, and willful and wanton acts and omissions, a judgment in the amount of $20,730,000 was enrolled against LBS and in favor of the Estate on the Judgment Index in the Horry County Court of Common Pleas.

## INSURANCE

24.     Insurance in one form or another is as old as historical society itself. The Plaintiffs are informed and believe that one of the first insurance companies in the United States was the Presbyterian Ministers' Fund organized in 1759.

25.     Throughout American history, insurance has been one of the more important financial investments made by individuals and small businesses like LBS. In fact, commercial insurance performs a critical role in our nation's economy by protecting individuals and businesses from financial harm resulting from unforeseen accidents.

26.     In exchange for the payment of insurance premiums, insurers contractually obligate themselves to provide financial protection to their insureds in the event of loss.

27.     In general, insurance companies owe their insured three primary duties: (1) investigate claims reasonably and properly, (2) provide a defense if the potential for liability exists, and (3) attempt to effect—on a timely basis—reasonable settlements of third-party claims within policy limits. Embedded in these duties is the requirement that the insurance company must consider the insured's interests.

28.     The paradigm of insurance distribution in the United States is the private market which is occupied by large insurance companies like Arch which has upon information and belief more than $15,000,000,000 in capital.

29.     In traditional private markets, consumers play an important role in market corrections because they are well informed at the point of sale as to a given product in comparison to its competitors.

30.     In the insurance market, however, consumers have no mechanism to educate themselves in determining from whom to purchase insurance. The most important factor any consumer needs to know is whether the insurance company will comply with its legal obligations to the consumer and ensure the consumer receives the benefit of the insured's bargain after the consumer pays the premium. Regrettably, some insurers like Arch fail to provide insureds with any information at the point of sale from which they can evaluate and compare the company's claims practices prior to paying the insurance premium.

31.     In addition, and unlike in traditional private markets, the consumer is powerless to negotiate after the point of sale to ensure it receives the benefit of the bargain, i.e., insurance protection in exchange for the premium paid.

32.     In most private markets a seller's profitability is determined in large part at the point of sale, i.e., the margin. However, in the private insurance market, the seller's profitability is directly related to what happens after the point of sale. For that reason and others, large insurance companies like Arch retain exclusive control over all aspects of a claim including the investigation, defense and decision whether to settle the claim.

33.     As a result, another potential area for market abuse relates to the manner in which insurers conduct claims practices on behalf of their insured. Claims practices represent the largest

expense for insurance companies like Arch, and therefore reducing payments has the greatest potential to impact a company's bottom line.

34.     Further, delaying payments is advantageous to large for-profit insurance companies like Arch because they pool and invest premium dollars, and therefore the longer the pooled premiums remain invested, the more revenues the company generates.

35.     The agency relationship between the carrier and the insured is another area of potential market abuse. Unlike in traditional markets, the consumer has little to no power beyond the point of sale. Rather, the insured renders its entire performance when the premium is paid and therefore cannot withhold its performance to provide an incentive for the carrier to fulfill its obligations.

36.     For the distribution of insurance in America to work properly, it is incumbent upon insurance carriers to comply with the legal obligations owed to the insured and to refrain from placing the company's self-serving financial interests ahead of the insureds by interfering with or preventing the insured from receiving the insurance benefits which were bought and paid for at the point of sale.

37.     As a result of the foregoing, insureds like LBS are at risk of being manipulated by large insurance companies like Arch and are subject to financial abuse if insurance companies fail to comply with the prevailing standards of care within the insurance industry, the terms of the insurance contract, and the implied covenant of good faith and fair dealing, which among other things ensures that neither party will do anything to impair the other's rights to receive benefits under the contract.

38. An insurance company's legal obligation to comply with its implied covenant of good faith and fair dealing is critical for the paradigm of insurance distribution in the United States to work properly.

39. In 1990, the National Association of Insurance Commissioners (NAIC) promulgated the Unfair Claims Settlement Practices Act (UCSPA) with the purpose of "set[ting] forth standards for the investigation and disposition of claims arising under policies or certificates of insurance." The Model Act authorizes a state's insurance commissioner to enforce its provisions through statement of charges, cease and desist, and penalty orders. The UCSPA further outlines activities constituting unfair claims practices, which "include (1) misrepresentation of insurance policy provisions, (2) failing to adopt and implement reasonable standards for the prompt investigation of claims, (3) failing to acknowledge or to act reasonably promptly when claims are presented; and (4) refusing to pay claims without an investigation."

40. Subsequent thereto, the State of South Carolina enacted the South Carolina Claims Practices Act (SCCPA), *see* S.C. Code Ann. §§ 38-59-10, *et seq.*, which forms part of the standard of care for any insurance carrier like Arch doing business in the State of South Carolina. The SCCPA clearly sets forth specific statutory requirements for any insurance carrier writing insurance within the state.

41. More particularly, the SCCPA provides in part that insurance carriers doing business in the State of South Carolina must not:

   a. Fail to adopt and implement reasonable standards for the prompt investigation and settlement of claims, including third-party claims;

   b. Fail to act in good faith to effect prompt, fair and equitable settlement of claims including third-party claims;

   c. Offer to settle claims, including third-party liability claims, for an amount less than the amount otherwise reasonably due and payable; and

9

      d. Unreasonably delay or unreasonably fail to settle claims in full, including third-party claims.

42. Plaintiff is informed and believes that responsible insurance carriers doing business in South Carolina respect and adhere to the prevailing standard of care which includes the South Carolina Claims Practices Act. Furthermore, Plaintiff is informed and believes that responsible insurance carriers doing business in South Carolina respect this State's citizenry and their elected General Assembly who enacted the Act.

43. As will be detailed herein and proven at the trial of this important case, Arch has at every turn manipulated, abused and exploited for its own financial gain the paradigm of insurance distribution in general and more particularly with respect to the *Wolde Claim* and has caused LBS to suffer direct and irreparable harm and damages.

44. In addition, at all times relevant hereto, there existed an implied covenant of good faith and fair dealing which required Arch to implement the agreement as intended, which was to protect LBS from claims like those stemming from the August 24, 2018 drowning of Zerihun Wolde.

45. Pursuant to the contract of insurance and in exchange for payment of a premium in excess of $150,000, Arch agreed to pay those amounts that LBS became legally required to pay as damages in the *Wolde Claim*.

46. Further, pursuant to the terms of the contract, Arch maintained total control over the investigation, defense of and settlement of the *Wolde Claim*. More particularly, the policy stated: "we have the right and duty to defend any claim…even if the allegations of the claim are groundless, false or fraudulent."

47.    Further, the contract of insurance provided: "We have the right to select and retain counsel to defend" LBS in the *Wolde* case and "we have the right to settle any claim…in the manner and to the extent we believe is proper."

48.    The contract prohibited LBS from taking its own steps to defend or protect itself, and LBS was therefore completely reliant on Defendants to protect its interests.

49.    Almost three years after the *Wolde* case was filed, and with trial approaching, the Defendants received a time-sensitive settlement communication dated April 13, 2022, in which the Estate offered to dismiss the case against LBS and to sign a full release of all claims provided Arch agreed to tender the entirety of indemnity dollars LBS had purchased to protect itself from this very financial risk.

50.    The April 13, 2022, time sensitive settlement communication further stated: "Arch Specialty has one opportunity to get this right because of the circumstances in this case; otherwise, the absolute maximum amount of damages will be sought. . . . This is not a negotiation tool, nor will this offer be available after May 2, 2022. The legal and financial exposure for Lack's cannot be over exaggerated."

51.    The liability against LBS had become reasonably clear during the first deposition taken in the case. More particularly, a former employee of LBS was deposed on October 20, 2021, and testified that the closest lifeguard responsible for water observation only—in contrast with lifeguards who were simultaneously responsible for both water observation and commercial sales of beach chairs and umbrellas—was approximately 10 blocks away from where Mr. Wolde and two of his children entered the water to play in the surf.

52.     Further, the first deposition established that LBS was understaffed on the day of the drowning at the very location where Mr. Wolde drowned, and that the insured had clearly violated the terms of the Franchise Agreement thereby creating irrefutable evidence of liability in the case.

53.     At all times relevant hereto, including before the April 13, 2022 settlement communication, the material facts of the case were not in dispute including but not limited to:

    a.   There was no dispute that LBS received rip current warnings the morning of August 24, 2018;

    b.   There was no dispute that the standard of care required LBS to take preventative measures to protect swimmers including Mr. Wolde and his children;

    c.   There was no dispute that LBS was responsible for properly and adequately staffing the lifeguard towers called for in the Franchise Agreement with the City;

    d.   There was no dispute that the lifeguard towers were not properly staffed on the day of the drowning in violation of the franchise agreement and standard of care;

    e.   There was no dispute that no LBS employee had any personal knowledge of having provided any warning of the known life safety hazards present in the water that day;

    f.   There was no dispute that LBS lifeguards performed dual roles while on duty including conducting water observation and commercial sales of beach chairs and umbrellas;

    g.   There was no dispute that assigning these conflicting responsibilities violated the prevailing standard of care; and

    h.   There was no dispute that no training records existed for the lifeguards at issue in the case.

54.     The fact that liability had become reasonably clear after the first deposition is demonstrated by, among other things, Arch's assigned counsel's opening statement to the jury:

"They have been operating Lack's Beach Service in the City of Myrtle Beach under a franchise agreement since 2018. There were agreements before that. And

12

**importantly**, Lack's Beach Service has to be in **compliance** with that **agreement**. **It starts and ends there . . . .**"

55.     For more than two years before trial, Defendants knew the insured failed to comply with the franchise agreement and any question about whether its insured was at risk should have "ended there."

56.     At no time during the litigation did Arch or its assigned counsel identify a single witness with expertise in aquatic safety who would opine that LBS complied with the standard of care.

57.     In contrast, Dr. Tom Griffiths, one of the country's foremost experts in aquatic safety, testified at his deposition and at trial to numerous and extensive violations of the standard of care which in his opinion were direct and contributing causes of Mr. Wolde's death.

58.     Further, Arch and assigned counsel were aware more than a year before trial that Chris Brewster, the head of the nation's leading authority (United States Lifesaving Association) in aquatic safety and the standard of care related to ocean lifeguards, agreed to and indeed did testify on behalf of the Estate.

59.     Further, Arch and assigned counsel knew that Mr. Brewster agreed to testify **free of charge** and travelled across the country at his own expense to appear personally at trial due to his concern over public safety in Myrtle Beach as it related to the *Wolde Claim*.

60.     Further LBS's defense in the case was compromised by the fact that the three employees at issue in the case were unavailable because they had come to the U.S. on a J-1 Visa and had since returned home to Europe.  Arch was unable to produce a single witness who had **any personal knowledge of what happened to Mr. Wolde and his two children.**

61.     At all times relevant hereto, Arch and McMahon were aware of the contractual and common law duties owed to LBS. Further, at all times relevant hereto, Arch and McMahon were

aware that an insurance carrier that writes insurance in this State is "duty bound under its contract of indemnity, and in good faith to sacrifice its interests in favor of the insured." *Columbia Ins. Co. v. Reynolds*, 438 F. Supp. 3d 614 (D.S.C. 2020).

62.     Likewise, and at all times relevant hereto, Arch and McMahon were aware that there was no reasonable basis to contest liability given the facts and circumstances developed throughout almost three years of litigation. Furthermore, Defendants were aware that under South Carolina's wrongful death statute, damages are awarded for the injury resulting from the death to the parties respectively for whom and whose benefit the claim is brought. S.C. Code Ann. § 15-51-40.

63.     Furthermore, Defendants knew the *Wolde Claim* was brought on behalf of and for the benefit of Mr. Wolde himself and each of his four children all of whom were in their tender years of life. Therefore, Defendants knew their insured was exposed to an excess verdict by virtue of these five distinct damages claims that, pursuant to South Carolina law, are brought under one caption.

64.      Because Arch and McMahon had no reasonable basis to contest liability or the extensive damages in the *Wolde Claim*, they knew they needed to come up with a purported "good faith" basis to justify their untoward motive of increasing the company's bottom line while leaving LBS exposed to an excess verdict.

65.     More particularly, Defendant McMahon knew that Arch needed a good faith basis to reject the settlement offer and that no good faith basis existed in the case itself considering, among other things, liability had become reasonably clear after the first deposition.

66.     Therefore, Defendant McMahon sought to cloak Arch's unreasonable decision to leave its insured exposed to an excess verdict with a veil of reasonableness by hoodwinking an

LBS employee into providing LBS's "consent" to reject the April 13, 2022 time-sensitive settlement communication offering to settle the claim within the available coverage.

67.     More particularly, sometime before May 2, 2022, McMahon orchestrated a telephone call between himself and Weslyn Chickering, an employee of LBS and the daughter of its owner. The call took place as a result of Arch's assigned counsel telling Ms. Chickering in a separate telephone call that Defendant McMahon "would be calling her" to discuss the time-sensitive demand and Arch's response thereto.

68.     Defendant McMahon knew Ms. Chickering did not have any ownership interest in LBS and could not legally speak on the company's behalf, nor was she a named insured against whom the claim had been brought.

69.     Further, and at all times relevant hereto, Defendant McMahon was employed by Arch Insurance Group, Inc., which is owned by and is a division of Arch Capital Group Ltd., which is a Bermuda-based for-profit company.

70.     Further, and all relevant times hereto, Defendant McMahon knew the company that employed him was not a party to the contract at issue and that Arch Specialty Insurance Company based out of Kansas City, Missouri, was the entity that issued the insurance coverage to LBS.

71.     Although his employer was not a party to the insurance contract, Defendant McMahon understood that a valid insurance contract existed between LBS and Arch Specialty Insurance Company and further understood the material terms of the contract based upon his many years in the insurance industry and more particularly as vice president of Arch Insurance Group's major case unit.

72.     As a result, Defendant McMahon at all times relevant hereto had knowledge of the indemnity obligations owed to LBS as well as the covenant of good faith and fair dealing implicit in the contract.

73.     Despite this knowledge, Defendant McMahon deliberately interfered with the contractual obligations owed to LBS by first leading Ms. Chickering to believe her approval or disapproval was required for Arch to respond to the April 13, 2022 time-sensitive settlement offer.

74.     He deliberately led her to believe the foregoing and withheld from her that, pursuant to the terms of the insurance contract, Arch had the exclusive power to reject or accept the settlement offer and that the policy **required** LBS to cooperate with its decision.

75.     Further, and at all times relevant hereto, Defendant McMahon knew Ms. Chickering would be an easier target to lure into "rejecting" the settlement offer considering Ms. Chickering had no ownership interest in LBS and was not at financial risk should Arch reject the settlement offer and subject LBS to an excess verdict.

76.     Further, and at all times relevant hereto, Defendant McMahon knew Ms. Chickering's father, George Lack, was the sole owner of LBS and stood to lose everything should Arch reject the settlement offer. Therefore, Defendant McMahon did not consult with George Lack regarding the impending decision on the settlement offer at any time prior to May 2, 2022.

77.     In addition, Defendants knew Ms. Chickering was not "experienced in legal matters generally and in making decisions of the type involved" nor did they ensure LBS was represented by independent counsel before purporting to get the insured's informed consent to place itself at extreme financial risk of an excess verdict.

78.     Defendant McMahon knew that if LBS was represented by independent counsel during this telephone call, he would not be able to get away with his misrepresentations nor would

he be able to achieve his unjust objective of placing Arch's financial interests ahead of the interests of LBS.

79.     Further, and at all times relevant hereto, Defendants knew that if they complied with the prevailing standard of care and acted in good faith, they would not be able to secure LBS's informed consent to place itself at extreme financial risk by rejecting the April 13, 2022 time-sensitive demand. Likewise, they knew it would be nonsensical for a small company like LBS to reject an offer that would resolve the lawsuit and secure a full and final release in its favor and at no cost to LBS.

80.     As a direct and proximate result of the foregoing, on May 2, 2022, Arch and McMahon rejected the April 13, 2022 time-sensitive settlement offer via letter signed by McMahon, which is attached hereto as Exhibit 2 and incorporated herein.

81.     Plaintiffs are informed and believe that if there was a genuine dispute as to liability or damages, those good-faith reasons would have been contained in McMahon's May 2, 2022 letter.  Instead, because there was no good-faith basis to contest liability or damages, Defendants failed to identify any facts which would lead a reasonable and prudent insurance carrier to believe its insured was not at risk of an excess verdict.

82.     More particularly, McMahon stated, "Without responding to every disputed assertion contained in the referenced settlement demand, Arch and Lack's must disagree with your assertions of liability."

83.     Furthermore, Arch's response stated: "**please be advised that Arch has consulted with Lack's about the facts and circumstances surrounding this matter and the Demand, and Lack's has advised Arch that the demand should be declined**."

84.    At all times relevant hereto, Defendants knew that pursuant to the terms of the insurance contract Arch had a non-delegable duty to protect LBS from an excess verdict and that the only reasonable option was to secure a release of its insured on or before the May 2, 2022 deadline.

85.    Plaintiffs are informed and believe, however, that Arch has implemented an irresponsible insurance business practice of using the claims process as a profit center instead of its intended purpose of protecting its insureds and, by exploiting the insurance industry, Arch has caused irreparable financial harm to innocent insureds including LBS.

86.    Plaintiffs are informed and believe that one of Arch's largest corporate expenses consists of claims paid, and therefore Arch has implemented irresponsible insurance business practices aimed at reducing the amount of money paid on claims to increase the company's financial bottom line.

87.    Plaintiffs are informed and believe that responsible insurance carriers do not propagate false narratives in support of their decision to leave their insured exposed to an excess verdict. Furthermore, responsible insurance carriers and assigned counsel have more respect for the jury than to peddle such false narratives.

88.    The Defendants, however, were not motivated by respect for others or protecting the interests of their insured. Rather, Defendants were singularly focused on their own self-serving financial interests and for that reason peddled a false narrative as a defense in the case because there was no truthful narrative to be found in discovery that proved their insured **had not** violated the standard of care.

89.    Proof of the foregoing is further demonstrated by the following statement by Defendants' assigned counsel during opening statements to the jury:

> "Now the franchise agreement provides for all of the lifeguards to go to lunch, every third lifeguard, for 45 minutes. And what that would **allow them is of course, when one lifeguard was at lunch, the two lifeguards on either side of them would watch their water,** the overlapping towers. That's the way it was set up."

90.     Plaintiffs are informed and believe that only reckless insurance carriers determined on saving/making money by any and all means necessary would peddle the foregoing as a defense to a wrongful death case **considering the defendants KNEW early in the case and beyond a shadow of a doubt** that the lifeguard who was supposed to be watching the water for the lifeguard who was supposedly at lunch **was not there** in violation of the franchise agreement and the prevailing standard of care.

91.     Furthermore, not only did Defendants know the lifeguard they said was required to be there was not present, they **KNEW** the reason the lifeguard was not on the lifeguard tower was because their insured moved that lifeguard to a tower where the lifeguard could also make commercial sales, whereas the tower left unguarded was designated as a lifeguard-only tower where no revenues were allowed.

92.     Because greed is a bottomless pit, and as further proof of Defendants' unreasonable, reckless actions leaving their insured at risk of financial insolvency, the Defendants' assigned counsel told the jury in opening statements:

> "What happened to them (Mr. Wolde and his two children) is a **mystery** because, really the only two people that have an opportunity to tell you about what happened are the two children."

93.     Plaintiffs are informed and believe that it takes a uniquely reckless insurance carrier to peddle such a false narrative to a jury considering Arch knew prior to trial that the jury would hear testimony from Julian Chandler, a Master Sergeant in the Air Force, who provided his trial testimony via a videotaped deposition in which he provided direct evidence proving liability against LBS.

94.    Even after Defendants caused LBS to suffer irreparable financial harm, when confronted with the foregoing Defendants refused to identify:

    a.    Any evidence offered by LBS at trial that shows it complied with the standard of care related to the hiring, training and staffing of lifeguards for the 2018 season;

    b.    Any evidence offered by LBS that shows the company was properly staffed on the day Mr. Wolde lost his life;

    c.    Any evidence offered by LBS that shows the company provided warnings or made any attempts to guard against the known rip current hazard present on the day Mr. Wolde lost his life;

    d.    Any evidence offered by LBS that shows the company provided any rescue efforts to Mr. Wolde during the time he and his daughter struggled for their life.

95.    Plaintiffs are informed and believe that a responsible insurance carrier would have welcomed the opportunity to identify the foregoing evidence to show the good-faith basis that led to their decision to reject the pretrial settlement offer and leave its insured exposed to an excess verdict.

96.    Defendants, however, have refused to identify any of the foregoing when asked to do so by LBS and the Estate.

97.    Fortunately, and for the benefit of Plaintiffs and all other Arch insureds in South Carolina, Defendants are required to answer the foregoing in this action. To avoid any attempted efforts Arch may undertake to confuse this Court or the trier of fact in this case, served herewith Defendants will find four simple interrogatories as identified in paragraph 91.

98.    Arch did, however, have the sworn testimony of the children, the mother, and bystanders, all of whom established liability against Arch's insured.

20

99.     Plaintiffs are informed and believe that it is patently unreasonable for any insurance carrier and in this case Arch to conclude the damages in the *Wolde Claim* constituted nominal damages.

100.    Plaintiffs are informed and believe, however, that racial animus and/or the naked desire to increase Arch's bottom line could lead an insurance carrier like Arch to convince itself that LBS was not at risk of an excess verdict.

101.    Further, the standard of care required Defendants to ensure that LBS had independent counsel to properly represent the company's (and Mr. Lack's) interests *prior to* rejecting the April 13, 2022 time-sensitive demand. This standard of care exists, of course, due to the inherent and obvious financial conflict between assigned counsel's duties to their client and the conflicting personal interests of counsel in preserving their relationship with the carrier (i.e., ensuring the assignment of future cases).  These competing interests are undoubtedly a "personal interest to the lawyer" and therefore a conflict of interest, *see* Rule 1.7(a), RPC, Rule 407, SCACR, along with Arch's irresponsible practice of putting its insured at financial risk to increase the company's bottom line.

102.    At all times relevant hereto, Defendants knew that to obtain informed consent, assigned counsel had to "make reasonable efforts to ensure" LBS possessed information "reasonably adequate to make an informed decision" on rejecting the time-sensitive demand. Rule 1.0 cmt. 6, RPC, Rule 407, SCACR.

103.    Because the Defendants were motivated by their own self-serving financial interests, they willfully violated their respective standards of care and legal obligations owed to LBS by fabricating LBS's consent to reject the time-sensitive demand.

104.     Arch and McMahon deliberately led LBS to believe it had provided informed consent and its consent was required for Arch to tender the liability limits, despite knowing the insurance policy gave Arch complete and total control over this important decision.

105.     More particularly, the insurance policy plainly stated: "We have the right to settle any claim…in the manner and to the extent **we** believe is proper." Furthermore, the insurance policy required LBS to "cooperate with us in the investigation or settlement of the claim or defense against the suit."

106.     Furthermore, Arch and McMahon made no effort to secure a release on LBS's behalf prior to rejecting the April 13, 2022 time-sensitive demand and refused to offer a single indemnity dollar to protect their insured.

107.     At all times relevant hereto, Arch and McMahon knew that any settlement offer made on their insured's behalf had to be reasonable under the circumstances and in consideration of the best interests of the insured who had bought and paid for the indemnity dollars.

108.     Despite the foregoing, Arch and McMahon communicated a settlement offer in the amount of $250,000 through assigned counsel via email dated June 7, 2022, which is attached as Exhibit 3 and incorporated herein.

109.     Arch and McMahon knew prior to communicating this offer that the damages compensable in the *Wolde Claim* included the damages of five different persons: the four children and their father's conscious pain and suffering. Therefore, the June 7, 2022 offer amounted to $62,500 per child for the loss of their father and zero dollars for Mr. Wolde's conscious pain and suffering.

110.     Arch and McMahon communicated a second unreasonable settlement offer in the
amount of $750,000 via assigned counsel's email dated June 17, 2022, which is attached as Exhibit
4 and incorporated herein.

111.     On August 4, 2022—*after* the entry of judgment on the jury's $20,730,000 verdict
in the *Wolde Claim* and therefore *after* LBS had suffered permanent injury to its business—Arch
(through assigned counsel) unreasonably offered to pay the full $3,000,000 in insurance benefits
for the first time.  The August 4, 2022 "offer" is attached as Exhibit 5 and incorporated herein.

112.     Thereafter, the Defendants received a second time-sensitive settlement
communication on August 31, 2022, approximately one month after entry of the $20,700,000
judgment, which is attached as Exhibit 6 and incorporated herein.  In the August 31, 2022 time-
sensitive settlement communication, the Estate offered to accept $20,700,000 in exchange for a
full and final release of all claims.

113.     The August 31, 2022 time-sensitive settlement communication stated, "The South
Carolina Supreme Court made it clear in *Reeves v. SCMIRF*, 862 S.E.2d 248 (S.C. 2021):

> When the verdict *far exceeded any view of policy limits, the Fund settled the case,
> leaving its insureds insulated from any excess judgment*.  While it is conceivable an
> insurer may subject itself to liability for consequential damages for bad faith
> conduct in some other respect, *we do not condone the idea an insurer may incur
> bad faith liability for simply taking a case to the jury, when the insurer satisfied the
> judgment after trial without exposing the insured to excess liability*."

114.     Further, the August 31, 2022 time-sensitive settlement communication stated:
"Arch's duty of good faith and fair dealing requires payment of this demand to protect its insured
from the excess verdict.  Anything less is per se bad faith.  **This time sensitive settlement
communication will remain open until 3:00pm on September 12, 2022.**  If the carrier fails to
accept this settlement demand in writing within the proscribed time limit the offer is withdrawn."

115.    A reasonable and responsible insurance carrier, having acted in bad faith in taking its insured to trial and exposing its insured to a devastating excess verdict, would have accepted the August 31, 2022 time-sensitive demand and protected its insured from the excess liability the insured faced as a result of the verdict.

116.    However, despite knowing that its bad-faith actions had exposed LBS to insolvency, Arch responded through new counsel on September 12, 2022, and refused to accept the August 31, 2022 time-sensitive settlement demand.  Instead, Arch relied on the trial record as somehow continuing to support its refusal to protect LBS but failed to mention that the trial record resulted in a $20,730,000 jury verdict against LBS, including a finding by clear and convincing evidence that LBS acted in a willful, wanton, or reckless manner.

117.    Furthermore, in contradiction to the South Carolina Supreme Court's opinion in *Reeves*, which was quoted in the August 31, 2022 time-sensitive settlement communication, Arch suggested it had no obligation to settle the *Wolde Claim* for more than the $3,000,000 policy limits, despite having unreasonably exposed its insured to a $20,730,000 judgment.  Arch failed to provide any good-faith basis for its continued refusal to protect its insured.

118.    The September 12, 2022 letter thus revealed Defendants' belief that Arch could coerce its insured to trial and expose the insured to an excess judgment which renders the insured insolvent and destroys the insured's business, but Arch would never have to pay more than the $3,000,000 policy limits and could saddle its insured with the remaining $17,730,000 of the excess judgment.

**FOR A FIRST CAUSE OF ACTION AGAINST ARCH**
**(Bad Faith-Rejecting the April 13, 2022 Time-Sensitive Demand, Rejecting the August 31, 2022 Time-Sensitive Demand, and Failing to Satisfy the Excess Judgment)**
**(Against the Arch Defendants)**

119.    The preceding paragraphs are repeated and realleged as if set forth verbatim herein.

120.    At all times relevant hereto, there existed between Arch Specialty Insurance Company and LBS a valid contract of insurance whereby LBS paid the carrier more than $150,000 in exchange for $3,000,000 of insurance benefits. Furthermore, at all times relevant hereto, Arch and its affiliated entities owed LBS contractual, common law and statutory duties to act as a reasonable and prudent insurance carrier with respect to their investigation, defense of and settlement of the *Wolde Claim*.

121.    Furthermore, and at all times relevant hereto, Arch and its affiliated entities were required to comply with the implied covenant of good faith and fair dealing which among other things required Arch to act as a reasonable and prudent insurance carrier and to refrain from acting unreasonably, acting in its own self-interest, or doing anything that would impair LBS' rights to receive the financial benefit it had bought and paid for.

122.    At all times relevant hereto, Arch and its affiliated entities owed contractual, common law and statutory duties to its insured, including but not limited to the duty to act as a reasonable and prudent insurance carrier and within the industry standards of care with regard to its investigation and defense of the *Wolde Claim* as well as its claims practices and efforts to protect LBS from an excess verdict.

123.    At all times relevant hereto, the standard of care required among other things that Arch adopt and implement reasonable standards for the prompt investigation and settlement of claims, including third-party claims.

124.    At all times relevant hereto, the standard of care also required among other things that, having unreasonably taken its insured to trial and exposed its insured to a verdict far in excess of the policy limits, Arch must attempt in good faith to settle or satisfy the excess judgment without exposing its insured to excess liability.

125.    Arch, however, repeatedly violated the duties owed to LBS—including the duty of good faith and fair dealing—and was negligent, grossly negligent, reckless, willful and/or wanton in numerous regards including but not limited to:

 a. Failing to act as a reasonable and prudent insurer and within the prevailing standard of care in its defense of the *Wolde Claim*;

 b. Failing to act as a reasonable and prudent insurer and within the prevailing standard of care in rejecting the April 13, 2022, time-sensitive settlement communication without a good-faith basis to do so;

 c. Failing to act as a reasonable and prudent insurer and within the prevailing standard of care by refusing to offer a single indemnity dollar on behalf of its insured prior to the deadline set forth in the April 13, 2022 time-sensitive settlement communication;

 d. Failing to make any effort to protect its insured between April 13, 2022, and May 2, 2022;

 e. Failing to timely settle the *Wolde Claim;*

 f. Fabricating a purported justification to reject the *Wolde* time-sensitive demand in allowing Defendant McMahon to hoodwink the insured and interfere with the indemnity obligations owed to LBS;

 g. Fabricating a purported justification to reject the *Wolde* time-sensitive demand by manipulating focus group research data by ensuring material facts proving liability would not be seen by focus group jurors;

 h. Misleading its insured into believing it was not at risk of an excess verdict;

 i. Making false and misleading statements to its insured;

 j. Making unreasonable settlement offers on its insureds' behalf;

 k. Failing to protect LBS from the excess verdict;

 l. Failing to put the insured's interest ahead of the company's own self-serving financial interest;

 m. Failing to implement appropriate claims handling policies and procedures to ensure compliance with the prevailing industry standards of care;

26

n. Failing to comply with the prevailing standard of care including the South Carolina Claims Practices Act;

o. Failing to exercise the degree of care, caution, and good faith and fair dealing that a reasonably prudent insurance carrier would have exercised under the same circumstances;

p. Conducting focus group research for its own selfish, financial purposes and not for the purpose for which such research is intended;

q. Failing to settle or satisfy the excess judgment post-trial to protect its insured from excess liability; and

r. Any and all other particulars which may be shown at trial.

126. As a direct and proximate result of the foregoing, Plaintiffs have suffered irreparable and extreme financial harm including actual, consequential and incidental damages including but not limited to $3,000,000 of lost insurance benefits, unnecessary litigation expenses, lost business income and the $20,730,000 judgment together with compounding post-judgment interest.

### FOR A SECOND CAUSE OF ACTION
**(Bad Faith-Selection and Retention of Assigned Counsel)**

127. The preceding paragraphs are repeated and realleged as if set forth verbatim herein.

128. At all times relevant hereto, Arch unreasonably placed its own financial interests ahead of the interests of its insured, including its selection of assigned counsel to defend LBS in the *Wolde Claim*.

129. In addition to Arch's indemnity obligations, it was required to provide a defense to its insured.

130. Pursuant to the contract of insurance, Arch reserved for itself the exclusive right to hire counsel to defend LBS in the *Wolde Claim* and to comply with the carrier's obligations to provide a defense.

131.    The implied covenant of good faith and fair dealing requires carriers to act in good faith with regard to selecting assigned counsel to protect the insured's interest. Stated differently, the implied covenant of good faith and fair dealing required Arch to assign counsel that would act in conformance with the attorney's prevailing professional standards of care.

132.    The tripartite relationship is a contractual alliance between three parties: (1) the insurance company that issued the policy; (2) the insured against whom a claim is made; and (3) the attorney hired by the insurance company to defend the insured.

133.    Inherent in the tripartite relationship is the potential conflict between an assigned counsel's duties to their client and the conflicting personal interests of counsel in preserving their relationship with the carrier (ensuring the assignment of future cases). These competing interests are undoubtedly a "personal interest to the lawyer" and therefore a potential conflict of interest pursuant to Rule 1.7 of the Rules of Professional Conduct.

134.    Plaintiffs are informed and believe that this potential conflict is one of the most written-about areas of American law because of the potential for harm to innocent insureds/clients.

135.    The Book of Matthew 6:24 cautions that "No one can serve two masters: for either he will hate the one and love the other, or he will hold to the one and despise the other."

136.    Furthermore, Plaintiffs are informed and believe that one of Arch's largest corporate expenses consists of claims paid, and therefore Arch has implemented irresponsible insurance practices including who it assigns as counsel to protect its insured in an effort to reduce the amount of money paid on claims.

137.    At all times relevant hereto, Arch was singularly focused on its self-serving financial interests and on abusing the proper distribution of insurance benefits including in the selection of assigned counsel to defend its insured.

138.    As a result, Arch was careful to select assigned counsel who it knew would do the carrier's bidding at the expense of the insured, despite the language in the insurance policy and the covenant of good faith and fair dealing requiring Arch to assign counsel who would "defend" LBS's interest to the exclusion of all others.

139.    At all times relevant hereto, Arch led LBS to believe assigned counsel was acting solely to protect LBS and withheld from LBS that assigned counsel in this case was doing the carrier's bidding.

140.    Regrettably for LBS and at all times relevant hereto, Arch breached its duty owed to LBS to act in good faith in the selection and retention of assigned counsel to defend the *Wolde Claim* by negligently, grossly negligently, recklessly, willfully and wantonly selecting counsel Arch knew would:

a.  Ensure the client was not advised that it faced the a risk of an excess verdict despite the attorney's duty to inform the client of the risk;

b.  Ensure the client was not advised of the financial ramifications of an excess verdict;

c.  Ensure the carrier never received a report letter from assigned counsel that indicated the risk of an excess verdict;

d.  Ensure the carrier never received correspondence from assigned counsel requesting that the carrier protect his client's interest by settling the claim.

141.    Defendants caused each of the foregoing to occur in the *Wolde Claim*, which lured LBS into a false sense of security and which directly and proximately caused LBS to suffer irreparable financial harm and consequential damages.

142.    Furthermore, Defendants selected and retained assigned counsel who they knew would and who did in fact leave LBS unrepresented at the most crucial moment in the claim: the decision whether to accept or reject the April 13, 2022 time-sensitive demand.

143.    Sometime prior to May 2, 2022, Defendant McMahon orchestrated a telephone call between himself and an LBS employee in an effort to fabricate a good-faith basis to reject the time-sensitive demand and in furtherance of Defendants' ongoing bad faith and unreasonable decisions which placed the insured at risk of extreme financial harm.

144.    Sometime prior to the call, assigned counsel informed the LBS employee that the adjuster would be calling her to discuss the time-sensitive demand.

145.    At all times relevant hereto, Defendants knew that if they assigned and retained counsel who refused to allow his or her duties of loyalty be compromised, then such lawyer would not allow the carrier to speak directly with the client without assistance of counsel regarding such a critical, time-sensitive matter.

146.    As a result, Defendants assigned and retained counsel who they knew would and who did in fact leave LBS unrepresented and who allowed LBS to be hoodwinked into believing it was not at risk and the time-sensitive demand should be rejected.

147.    As a direct and proximate result of the foregoing, LBS suffered irreparable financial harm and consequential damages.

148.    In addition to fabricating LBS's consent to place itself at risk of an excess verdict, Defendants deliberately manufactured another internal "good faith" basis in an effort to legitimize the company's irresponsible and unreasonable decision to leave its insured at risk of an excess verdict.

149.    More particularly, Defendants conducted a focus group with Sam Clawson, Esquire, who is a respected member of the Bar and who has developed a significant amount of expertise in focus group research.

150.    Plaintiffs are informed and believe that while the standard of care does not require assigned counsel or an insurance carrier to incur the costs of focus group research, the standard of care requires that if they undertake this endeavor the focus group should be conducted for the purpose of assessing LBS's exposure and not for nefarious, self-serving financial reasons.

151.    Instead of conducting the focus group for its intended good-faith purpose, Defendants conducted the focus group in order to manufacture defense verdicts to serve as support for their unreasonable decision to place LBS at extreme financial risk.

152.    More particularly, Defendants deliberately omitted key undisputed evidence which proved LBS was at risk of an excess verdict and instead focus grouped a sanitized version of the case they knew was materially different than the facts the jury would hear at trial.

153.    As was expected and intended by the Defendants, the focus group research produced four defense verdicts which Defendants used to justify refusing to protect the insured and to lure LBS into a false sense of security regarding the financial devastation that lay ahead.

154.    Furthermore, and armed with the artificial results from the focus group research, Defendants continued to lure LBS into a false sense of security regarding its exposure in the *Wolde Claim.*

155.    Defendants were aware that had LBS not been led into a false sense of security and/or demanded on or before May 2, 2022, that the time-sensitive settlement demand be accepted, then Defendants would have been forced to pay the available coverage which was at all times relevant hereto the reasonable thing to do. However, paying the available coverage would have been in conflict with the Defendants' true purpose and motive.

156.    As a direct and proximate result of the foregoing, LBS has suffered irreparable and extreme financial harm including actual, consequential and incidental damages, including but not

31

limited to $3,000,000 of lost insurance benefits, unnecessary litigation expenses, lost business income, and the $20,730,000 judgment together with compounding post-judgment interest.

## FOR A THIRD CAUSE OF ACTION
### (Breach of Contract)

157.    The preceding paragraphs are repeated and realleged as if set forth verbatim herein.

158.    At all times relevant hereto, LBS had valid and enforceable contracts of insurance with Arch Specialty Insurance.

159.    Arch Specialty Insurance breached those contracts of insurance in numerous particulars including:

> a.  Failing to fulfill its obligations under the contract;
>
> b.  Failing to perform its obligations to carry out the purpose for which the insurance contract was made;
>
> c.  Failing to properly evaluate the risk to LBS of an excess verdict;
>
> d.  Failing to properly defend LBS's interest during discovery and at trial; and
>
> e.  Failing to exercise the degree of care, caution, good faith and fair dealing that a reasonably prudent insurance carrier would have exercised under the same or similar circumstances.

160.    As a direct and proximate result and by virtue of the Assignment of Claims attached hereto and incorporated herein, Plaintiffs are entitled to recover the actual, consequential and incidental damages caused by Arch, including but not limited to $3,000,000 of lost insurance benefits, unnecessary litigation expenses, and the $20,730,000 judgment together with compounding post-judgment interest.

161.    Plaintiffs are entitled to judgment against Arch and its affiliated entities jointly and severally for all actual, consequential and incidental damages resulting from the contract being breached.

32

## FOR A FOURTH CAUSE OF ACTION
### (Tortious Interference)
### (Against McMahon)

162.    The preceding paragraphs are repeated and realleged as if set forth verbatim herein.

163.    Defendant McMahon is an executive at Arch Insurance Group who at all times relevant hereto had specific knowledge of the contracts of insurance between Arch Specialty Insurance Company and LBS which provided financial protection to LBS as well as the terms of the contract and the insurer's obligations contained therein.

164.    Defendant McMahon is a long-time corporate insurance executive who had actual knowledge of the purpose for which LBS had purchased the insurance from Arch as well as the relevant provisions of the contract of insurance.

165.    Plaintiffs are informed and believe, however, that at all times relevant hereto McMahon allowed his individual, professional and financial interests and that the interests of Arch Insurance Group to control his actions and omissions related to his investigation, defense of and efforts to settle the *Wolde Claim*.

166.    More particularly, McMahon received a settlement communication on April 13, 2022, which expressly indicated the Estate's willingness to execute a full release of all claims against LBS in exchange for Arch tendering its policy limits. The letter informed Arch and McMahon that it was the last opportunity to settle the *Wolde Claim* within Arch's policy limits. (See Exhibit 7, the "Demand," incorporated by reference herein). More particularly, the April 13, 2022 settlement correspondence stated:

> **THIS IS AN OFFER TO FULLY RESOLVE ALL CLAIMS AGAINST LACK'S BEACH SERVICE, INC. AND MUST BE COMMUNICATED IN ITS ENTIRETY TO THE CLIENTS, INCLUDING THE INSURED, THE INSURANCE REPRESENTATIVES AT ARCH SPECIALTY INSURANCE COMPANY AND ALL INSURANCE DECISION MAKERS.**

33

167.    The Demand was not unlike other correspondence McMahon had received and was charged with responding to, with one exception: there was no reasonable basis from the more than two years of discovery upon which any reasonable insurance carrier could conclude liability would be resolved in favor of the insured.

168.    Furthermore, McMahon knew the *Wolde Claim* was not a nominal damages claim because the claim included the compensable damages of four children, all of whom were in their tender years of life and had lost their father.

169.    Moreover, McMahon knew the children experienced unimaginable damages as a result of witnessing their father's death in general and more particularly for the oldest daughter who clung to her father as he saved her from the rip current and struggled for his own life.

170.    For these reasons and others Arch and McMahon knew there was no reasonable basis to refuse to tender the policy limits and secure a full and final release of all claims on or before the deadline set forth in the Demand.

171.    As a result, McMahon endeavored to fabricate a "good faith" basis to reject the Assignee's time-sensitive demand by tortiously interfering with the terms of the insurance contract, intentionally procuring a breach of the indemnity obligations owed to LBS, and intentionally procuring Arch's breach of its covenant of good faith and fair dealing.

172.    Further, and at all times relevant hereto, McMahon acted without reasonable justification but instead acted in an unreasonable, irresponsible and unjust manner.

173.    As a direct and proximate result of McMahon's tortious interference with the contractual obligations, including the covenant of good faith and fair dealing, LBS suffered extreme prejudice, irreparable harm, and actual, consequential and incidental damages including

but not limited to $3,000,000 of lost insurance benefits, unnecessary litigation expenses, and the

$20,730,000 judgment together with compounding post-judgment interest.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a trial by jury and for the following:

i.      Judgment against the Defendants, individually, jointly and severally;

ii.     Actual damages, special damages, consequential damages, and treble damages in an amount to be determined by the jury;

iii.    Punitive damages, to be assessed individually and jointly and severally, in an amount to be determined by the jury;

iv.     Costs of this action and reasonable attorney's fees; and

v.      And all such other and further relief this Honorable Court deems just and proper.

**McLeod Law Group, LLC**
3 Morris Street, Suite A
Charleston, SC 29403
Tel. 843-277-6657
Fax 843-277-6660

_s/W. Mullins McLeod, Jr._
W. Mullins McLeod, Jr.
H. Cooper Wilson, III

and

G. Murrell Smith, Jr.
Smith Robinson
126 N. Main Street
Sumter, SC 29151
Tel. 803-778-2471

Attorneys for the Plaintiffs

July 31, 2023
Charleston, South Carolina