# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# FLORENCE DIVISION

| | |
|---|---|
| The Estate of Zerihun Wolde, individually and as assignee and Lacks Beach Service, individually and as assignor, | ) )  Case No.: 4:23-cv-03710-JD ) ) |
| Plaintiffs, | )  **MOTION TO COMPEL** ) |
| vs. | ) ) |
| Arch Specialty Insurance Company, Arch Insurance Company, and Arch Insurance Group, Inc., | ) ) ) ) |
| Defendants. | ) ) ) |

Pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure, Local Civil Rule 37.01, the Court's filing preferences, and the Court's March 22, 2024 text order authorizing this motion, Plaintiffs move for an order compelling the Arch Defendants to fully respond to Plaintiff's discovery requests and to produce all documents requested by Plaintiffs. The Arch Defendants refuse to disclose the facts of this insurance bad faith lawsuit to their own insured, primarily on the ground that some of the materials in their possession are subject to an attorney-client privilege held by the insured. But the Arch Defendants' resistance to discovery in this case is not borne from a desire to protect the insured's interests. The Arch Defendants could have protected the insured's interests in the underlying litigation and avoided this lawsuit altogether. Instead, they sacrificed the insured's interests in favor of their own interests, and they continue to prioritize their own interests now. The Court should not allow them to evade accountability for their actions in the underlying case. They must be compelled to engage in meaningful discovery into the facts of this bad faith case.

# FACTS AND PROCEDURAL HISTORY

## I. Introduction

This case arises out of the Arch Defendants' bad-faith insurance practices. The facts of Plaintiffs' claims against the Arch Defendants are fully set forth in prior briefing. *See* ECF Nos. 1, 10, 28, 30. Lack's Beach Service ("LBS") is a small family-owned and -operated business which has provided beach services, including lifeguarding, to Myrtle Beach residents and visitors for more than thirty years. Compl. p. 1 (ECF No. 1). On November 24, 2018, Zerihun Wolde, a father of four on vacation with his family drowned during lifeguard hours while trying to save his daughter from a rip current. *Id.* Mr. Wolde's Estate initiated a wrongful death suit against LBS and the City of Myrtle Beach stemming from the drowning in the Horry County Court of Common Pleas (the "*Wolde Claim*"). *Id.* The *Wolde Claim* resulted in a $20,730,000 jury verdict against LBS. *Id.* ¶ 23.

LBS assigned to the Estate its claims and causes of action against the Arch Defendants for failing to comply with the contractual obligations owed to LBS, failing to act reasonably in the investigation and handling of the claim—including in the defense and settlement of the claim—and failing to comply with the duty of good faith and fair dealing. The Estate and LBS jointly filed this action asserting claims for bad faith and breach of contract against the Arch Defendants.

## II. The Underlying Action

Pursuant to a franchise agreement it entered into with the City of Myrtle Beach, LBS was authorized to sell beach chairs and other items on city beaches in exchange for LBS providing lifeguarding services to protect beachgoers. Neither the franchise agreement nor the prevailing standard of care allowed lifeguards to sell merchandise while at the same time being responsible for observing the water. In the underlying action, there was zero dispute but that at all relevant

times LBS violated the standard of care and the franchise agreement by, among other things, assigning the purported lifeguards these conflicting responsibilities. More particularly, discovery in the underlying litigation and the evidence presented at the underlying trial established the following undisputed facts:

- LBS violated the franchise agreement and the standard of care by failing to provide lifeguard protection at the "lifeguard-only" tower on the section of beach where Mr. Wolde drowned.

- LBS violated the standard of care by failing to provide any warnings or to guard in any way against the dangerous rip currents present that day and which LBS received warnings about.

- LBS violated the standard of care by failing to recognize Mr. Wolde and his children as distressed swimmers and by failing to provide any rescue efforts whatsoever during the approximately 15-minute window in which Mr. Wolde struggled to save his daughter from the rip current.

- As Kelli Sullivan admitted in her deposition in this case, at no point in the underlying case did any facts ever exist placing liability in dispute. LBS never had a substantive factual defense that it complied with the standard of care.

- Sullivan also admitted liability was proven at the first deposition taken in the underlying case.

- Sullivan further admitted it was never in dispute, at any time in the underlying case, that LBS was understaffed, that LBS did not provide lifeguard protection on the section of beach where Mr. Wolde drowned, that LBS did not display red flags or provide rip current warnings on the relevant section of beach, and that no LBS lifeguard ever entered the water to try and rescue Mr. Wolde.

- The defense did not present any witnesses at trial who had any personal knowledge of what happened to Mr. Wolde.

- The defense did not present any evidence at trial that LBS had complied with its standard of care on the day Mr. Wolde drowned.

- The Estate presented expert testimony from a nationally recognized expert in the field of aquatic safety who expressed numerous opinions regarding LBS's violations of the standard of care and proximate cause.

- LBS did not present any expert witness at trial to counter the Estate's expert nor did they present any witness to rebut the testimony of Chris Brewster, the former head of

3

the United States Lifesaving Association which is the nation's professional association for lifeguards and open water rescues.

Despite lacking any defense to the Estate's claims at any point during the litigation, the Arch Defendants refused to settled the *Wolde Claim* and exposed their insured to a crippling excess judgment.

### III. Discovery in This Case

Although Plaintiffs have attempted to conduct discovery as provided in the federal rules and keep this case on an appropriate pace under the Court's scheduling order, the Arch Defendants (along with several non-parties) have largely refused to cooperate in discovery. Plaintiffs served written discovery requests on the Arch Defendants, but the Arch Defendants objected to most of Plaintiffs' requests and only produced documents that were either filed or exchanged in the underlying case, and thus were already in Plaintiffs' possession. *See* Arch Defendants' Discovery Responses, **Exhibit A**. The Arch Defendants have produced only one document material to the facts of this case—a printout of text messages between Brian McMahon and Kelli Sullivan during the underlying trial, which were retrieved from McMahon's cell phone. *See* McMahon Cell Phone Docs, **Exhibit B**. A non-party, Turner, Padget, Graham & Laney, produced copies of emails sent by its former attorney, Kelli Sullivan, during the underlying trial. Sullivan Official Trial Reports, **Exhibit C**. Plaintiffs deposed Sullivan on February 14, 2024.

Aside from the above materials, the Arch Defendants and non-parties continue to resist disclosure of the facts of this lawsuit. The Arch Defendants have maintained that all other documents material to this case—including information from a pretrial focus group they conducted in the underlying case—are somehow protected by the attorney-client privilege. *See generally* Arch Defendants' Discovery Responses, **Ex. A**; Templeton Letter to J. Dawson, **Exhibit D**. Although Plaintiffs' counsel has conferred with the Arch Defendants' counsel, *see* McLeod

Conferral Letter, **Exhibit E**, and the parties had a status conference with the Court, the parties have not been able to resolve the outstanding discovery issues.

The facts revealed by the limited discovery conducted so far demonstrate the need for the Arch Defendants to fully respond to Plaintiffs' discovery requests so the parties can prepare this case for trial.

   A.   **The Text Messages and "Official" Trial Reports**

According to the limited materials produced by the Arch Defendants, the night before the underlying trial began, Brian McMahon, the Arch vice president who served as the claims adjuster for the *Wolde Claim*, contacted Kelli Sullivan, who was at that time an attorney at Turner Padget. McMahon Cell Phone Docs 006–007, **Ex. B**. McMahon asked Sullivan to attend the trial and report to him on the developments during trial. *Id.* Prior to trial, Sullivan had represented the City of Myrtle Beach, which was a co-defendant in the *Wolde Claim*. The trial judge dismissed the City of Myrtle Beach from the *Wolde Claim* shortly before trial began. Sullivan agreed to attend the trial and report to McMahon. Her role in the *Wolde Claim* thus shifted from counsel for the City of Myrtle Beach to counsel for McMahon and Arch.

At the conclusion of each day of trial, Sullivan emailed McMahon an "official" report on that day's proceedings. *See* Official Trial Reports, **Ex. C**. However, she also communicated with McMahon privately via text messages and telephone calls throughout each trial day. *See* McMahon Cell Phone Docs, **Ex. B**. In the evening after the first day of trial concluded, Sullivan sent an email to McMahon and attached a memorandum providing her subjective analysis and interpretation of the day's events. *See* Official Trial Reports, TPGL_0003, **Ex. C**. She cast the first day of trial in a light favorable to the defense, explaining she was "very pleased with the jury that was seated," noting the jury's demographics—including that they were all White—and giving

5

the defense's opening statement a higher letter grade than she gave the Estate's opening statement. *Id.*

The same evening, Sullivan sent McMahon a text message asking how she should bill McMahon for her time. McMahon responded, "Just put it on a statement and send to me - no where else." McMahon Cell Phone Docs 017, **Ex. B**. Sullivan replied that she would open a "dummy" file at Turner Padget and use that dummy file to print an invoice to send to McMahon. *Id.* The following morning, on the second day of trial, McMahon sent a text message to Sullivan instructing her to send future reports via email only (rather than via attachment to an email) because he needed to "circulate" the emails within Arch. *Id.* at 020.

Throughout the trial, Sullivan and McMahon both knew that no evidence existed supporting any substantive defense against the Estate's claims. For example, Sullivan and McMahon both knew no evidence existed showing that LBS complied with the standard of care on the day Mr. Wolde drowned. They also knew that no red flags (which indicate hazardous surf conditions) were flying at the only lifeguard tower in the vicinity of Mr. Wolde's drowning and that substantial evidence existed proving the presence of dangerous rip currents on the day Mr. Wolde died. Nonetheless, at the end of each trial day, Sullivan wrote an "official" trial report suggesting the evidence presented at trial that day favored LBS, despite the lack of any evidence supporting LBS's defenses.

In contrast to the "official" trial reports Sullivan sent for consumption by Arch decisionmakers, her private text messages with McMahon painted a different picture of the trial. Sullivan and McMahon exchanged text messages indicating the trial was going poorly for the defense—so poorly, in fact, that McMahon emphasized the need to settle the case and

acknowledged that LBS wanted the case settled. McMahon Cell Phone Docs 030–032, 043–044, 047, **Ex. B**.

Sullivan's text messages with McMahon also reveal the malice with which they viewed the Wolde family and handled the *Wolde Claim*. The night before trial, McMahon texted Sullivan, "Obviously you and I know the type of jury we want." *Id.* at 007. The next day, after the trial court seated an all-White jury and Sullivan texted McMahon that the jury was "[a]ll white. 3 men, 9 women," McMahon replied, "Looks good I imagine." *Id.* at 012. Sullivan wrote in her official report after jury selection, "Overall, I am very pleased with the jury that was seated." Official Trial Reports, TPGL_0003, **Ex. C**. During jury selection, McMahon and Sullivan also discussed the results of the pretrial focus group. McMahon texted Sullivan, "I remember the mock trial Women hated the mom here." McMahon Cell Phone Docs 009, **Ex. B**. McMahon and Sullivan were motivated by a desire to "fight" the Estate rather than protect LBS. *Id.* at 009 (McMahon: "You love the fight. Admit it. I do.").

When the trial court did not rule in the manner the Arch Defendants preferred, McMahon and Sullivan criticized the judge and accused her of bias:

| | |
|---|---|
| McMahon: | "She is terrible." |
| Sullivan: | "These are pretty bad rulings. Lots of appellate grounds." |
| McMahon: | "It's clear she is bending over backwards for the plaintiff as a give back for the city's dismissal." |
| Sullivan: | "I think so too." |

McMahon Cell Phone Docs 039–042; *see also id.* 035 (McMahon: "This judge is making awful rulings. Might make the case settle."); *id.* 038 (McMahon: "Not sure - but it might be time to walk away. Bad judge.").

During trial, despite acknowledging in text messages (but not in the official reports) that the defense was not succeeding and that LBS wanted the case settled, McMahon and the Arch Defendants offered $1,000,000 to settle the case—only one-third of the $3,000,000 policy limits. *See* McMahon Cell Phone Docs 047, **Ex. B**. The $1,000,000 offer was fair, in McMahon's view, because it amounted to "250 a kid" for the four children who lost their father on the section of beach LBS failed to guard. *Id.* at 052. That is how McMahon and the Arch Defendants valued Mr. Wolde's life—"250 a kid."

**B.** **Deposition of Kelli Sullivan**

During her February 14 deposition in this case, Sullivan confirmed that none of the material facts in the underlying case were ever in dispute. She acknowledged:

- LBS did not offer an expert witness at trial to testify on its behalf with regard to the standard of care. Sullivan Depo at 59:25–60:3, **Exhibit F**.

- There was no red flag on the lifeguard stand where Mr. Wolde lost his life. *Id.* at 62:10-14.

- Nobody from LBS ever entered the water to provide assistance to Mr. Wolde. *Id.* at 75:23–76:4.

- LBS never had a substantive factual defense that it complied with the standard of care with regard to the lifeguard tower at issue in the underlying case. *Id.* at 96:7-13.

- The defense in the underlying case never presented any testimony that any lifeguard manned the tower on the section of beach where Mr. Wolde drowned. *Id.* at 98:10-14.

- It was undisputed that LBS received rip current warnings on the day Mr. Wolde drowned. *Id.* at 103:16–104:4.

- No lifeguard testified that LBS provided any rip current warning on the section of beach where Mr. Wolde drowned. *Id.* at 105:19-23.

- The fact that LBS was understaffed on the day Mr. Wolde died—and understaffed on the section of beach where he drowned—was never in dispute at any time in the case and was proven by the first deposition taken in the case. *Id.* at 108:7–109:16.

- It was an undisputed fact at all times during the underlying case that the closest lifeguard tower where any lifeguard was assigned water observation only was eight city blocks away from Mr. Wolde. *Id.* at 112:9-15.

- Although LBS lifeguards were required by the standard of care and franchise agreement to be properly trained, at no time during the underlying case did LBS identify any witness who had any personal knowledge of actually training the lifeguards at issue in the case. *Id.* at 122:25–123:20.

She also conceded that McMahon's text messages accused the trial judge of being "on the take" solely because the judge issued some rulings against the defense:

Q. That is an allegation that [the trial court] is on the take; do you understand that?

A. That's what he said, yes.

Q. And what do you say, Ms. Sullivan, in response?

A. I said, "I think so too."

Sullivan Depo at 265:7-13, **Ex. F** (form objection omitted).

## **LEGAL STANDARD**

Discovery is "broad in scope and freely permitted." *Mylan Lab'ys, Inc. v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1993). Federal Rule of Civil Procedure 26(b)(1) provides,

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

The broad relevance requirement encompasses "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Courts must broadly construe rules that enable discovery and must narrowly construe limitations on discovery, including the attorney-client privilege. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co.*, 967 F.2d

980, 983 (4th Cir. 1992) (noting "the discovery rules are given 'a broad and liberal treatment'" (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947))); *Hawkins v. Stables*, 148 F.3d 379, 383 (4th Cir. 1998) (explaining the attorney-client privilege "impedes [the] full and free discovery of the truth" and therefore "is to be narrowly construed" (alteration in original) (citation omitted)).

The party opposing a motion to compel bears the burden of showing why the motion should not be granted. *Cardoso v. Holder Constr. Co.*, No. 2:16-CV-1058-PMD, 2017 WL 976315, at *1 (D.S.C. Mar. 14, 2017). This Court has broad discretion to resolve discovery disputes and grant or deny a motion to compel. *See Erdmann v. Preferred Rsch., Inc. of Ga.*, 852 F.2d 788, 792 (4th Cir. 1988).

## ARGUMENT

The Arch Defendants' discovery objections are unfounded. The objections fall into two main categories. First, the Arch Defendants contend the vast majority of their claims files and materials related to the underlying litigation are somehow protected by an attorney-client privilege held by LBS. Second, the Arch Defendants contend several requests are irrelevant.

Each objection is improper and meritless. The Arch Defendants have no attorney-client privilege to assert over any of the materials from the underlying litigation, and the common interest doctrine on which they rely does not cloak their own materials with any privilege. Moreover, relevance is a low bar, as this Court noted at the March 22 status conference, and all the materials requested by Plaintiffs bear on issues that are or may be in this case. The materials are therefore relevant. The Court should order the Arch Defendants to produce all materials requested by Plaintiffs.

**I.     The Arch Defendants' privilege claims are unfounded.**

The Arch Defendants primarily argue that the materials sought by Plaintiffs are privileged. They seem to concede that they do not own any privilege over the materials, but they contend the common interest doctrine requires them to assert LBS's privilege over the materials. The Arch Defendants' objections are improper for several reasons.

First, the Arch Defendants have no privilege to assert. The attorney-client privilege belongs to the client—LBS—not to counsel or the insurance carrier. *Wilson v. Preston*, 378 S.C. 348, 359, 662 S.E.2d 580, 585 (2008); *see also Sentry Select Ins. Co. v. Maybank L. Firm, LLC*, 426 S.C. 154, 160, 826 S.E.2d 270, 273 (2019).[1] It therefore cannot be invoked by third parties such as the Arch Defendants. *See id.*; *In re Grand Jury Proceedings #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 250 (4th Cir. 2005); *Underwriters Ins. Co. v. Atlanta Gas Light Co.*, 248 F.R.D. 663, 670 (N.D. Ga. 2008). LBS is a plaintiff in this action. LBS served discovery requests on the Arch Defendants seeking production of the Arch Defendants' files, all of which are maintained for the benefit of LBS. LBS is, in effect, requesting that the Arch Defendants produce LBS's own materials to LBS. Yet the Arch Defendants refuse to comply on the ground that LBS holds an attorney-client privilege over those materials. Instead of acting in the best interest of their insured, they are withholding the facts of this case from their insured to protect their own interests and in an effort to prejudice the rights of their insured. The Arch Defendants' position is unsurprising—at no point since the initiation of the *Wolde Claim* have the Arch Defendants acted in the interest of their insured, despite being required to do so under South Carolina law. *Sentry Select*, 426 S.C.

---

[1] South Carolina attorney-client privilege law applies in this action. *See In re Mt. Hawley*, 427 S.C. at 164, 829 S.E.2d at 710 ("Because this is a diversity action involving claims for which South Carolina law provides the rule of decision, South Carolina's law of attorney-client privilege applies.").

at 158, 826 S.E.2d at 272. The Court should compel the Arch Defendants to produce the materials requested by LBS because they constitute the facts of this case and are needed by LBS to protect and advance its own interest. It is clear that the Arch Defendants do not want their insured to have access to the file that was prepared for and on behalf of *the insured*.

Second, facts are never privileged. *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981) ("[T]he protection of the privilege extends only to *communications* and not to facts." (alteration in original)); *Layman v. Junior Players Golf Acad., Inc.*, No. 9:15-CV-01463-DCN, 2016 WL 11509599, at *4 (D.S.C. Jan. 19, 2016) ("The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." (quoting *Upjohn*, 449 U.S. at 395)). The materials requested by Plaintiffs constitute the ***facts*** of this bad faith lawsuit. The claims files, reports, communications with assigned counsel, and focus group materials—which are referenced in the text messages between McMahon and Sullivan—all show how the Arch Defendants evaluated and processed the underlying case. The materials are not privileged.

Third, the Arch Defendants' entire file cannot be privileged. The attorney-client privilege applies to ***communications*** from LBS to its counsel. *State v. Doster*, 276 S.C. 647, 651, 284 S.E.2d 218, 219–20 (1981). The only potentially privileged materials in the Arch Defendants' files are ***communications*** from LBS to assigned counsel, which assigned counsel then disclosed to Arch. *Muhler Co., Inc. v. State Farm Fire & Cas. Co.*, No. 2:17-CV-01200-DCN, 2018 WL 4599587, at *3 (D.S.C. Sept. 25, 2018) ("[T]he only privileged communication between the insurer and the insured's counsel is communication that is privileged as to the insured and its counsel, which is then disclosed by the counsel to the insurer."), *on reconsideration*, No. 2:17-CV-01200-DCN, 2019 WL 2419016 (D.S.C. June 10, 2019). Any other materials in the Arch Defendants' files—

12

including claim file notes, reports, communications with assigned counsel, and any other materials—are not privileged. Nonetheless, the Arch Defendants have refused to produce ***any*** materials in their possession other than filings and discovery exchanged in the underlying case. They cannot assert privilege as a blanket protection over all materials. Instead, they must separate the privileged communications from LBS to assigned counsel and produce the rest of their files in their entirety.

The Arch Defendants appear to rely on the common interest doctrine as a basis for refusing to produce the materials requested by Plaintiffs. The common interest doctrine is not a privilege in itself and does not cloak otherwise non-privileged matters with some kind of "joint" or "common" privilege. The doctrine provides only that the parties do not waive otherwise privileged communications by disclosing the communications to each other. *See Tobaccoville USA, Inc. v. McMaster*, 387 S.C. 287, 295, 692 S.E.2d 526, 531 (2010). The common interest doctrine does not protect the Arch Defendants from producing the materials requested by Plaintiffs because any materials other than communications from LBS to assigned counsel are not privileged. Regardless, producing the materials to LBS—with which the Arch Defendants purportedly share a "common interest"—does not run afoul of the attorney-client privilege. On the contrary, the doctrine allows them to share privileged materials with others under the common interest doctrine umbrella without waiving any privileges. Thus, the common interest doctrine on which they rely actually favors production of the materials they are withholding.

Even if the Court entertains the Arch Defendants' privilege assertions in the face of LBS's request for all materials, privileged and non-privileged, the Arch Defendants cannot avoid production of their entire files. They must separate the privileged ***communications***, produce a privilege log establishing the elements of the attorney-client privilege for each communication,

and produce the rest of their files.  Even if the reports and other materials contain information learned from privileged communications, the Arch Defendants must produce those materials because the materials are not privileged ***communications***.

Fourth, the Arch Defendants' privilege log is insufficient to establish that the withheld items are privileged.  The Arch Defendants bear the burden of proving a privilege applies to each document or communication they wish to protect from discovery, and their privilege log must identify each document or communication and explain why each is privileged.  *See* FED. R. CIV. P. 45(e)(2) ("A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must: (i) expressly make the claim; and (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim."); FED. R. CIV. P. 26(b)(5)(A) (same).  The Arch Defendants assert that essentially their entire file related to the *Wolde Claim* is privileged, and their privilege log vaguely lists "Attorney-Client Privilege; Common Interest Doctrine and/or Duty of Confidentiality" as the privilege basis for the vast majority of withheld documents.  *See* Privilege Log, **Exhibit G**.  The privilege log contains no dates, which makes it impossible to analyze the timing of any withheld materials.

Their failure to produce an adequate privilege log precludes their privilege assertions, and the Court should order them to produce all withheld materials.  *See AVX Corp. v. Horry Land Co.*, No. 4:07-CV-3299-TLW-TER, 2010 WL 4884903, at *3 (D.S.C. Nov. 24, 2010) ("Generalized claims of privilege are insufficient. . . . [A] party seeking protection from producing documents must produce a privilege log that 'identifies each document withheld, information regarding the nature of the privilege/protection claimed, the name of the person making/receiving the communication, the date and place of the communication, and the document's general subject

matter.' The party asserting the privilege 'must identify the elements of the applicable privilege and demonstrate that each element is present for each document for which they claim the existence of a privilege.'" (citations omitted)).

Fifth, the Arch Defendants' privilege assertions regarding their communications with Kelli Sullivan and Turner Padget are baseless for the same reasons articulated above. The Arch Defendants have no privilege to assert. Even if they possess any privileged communications **between the City of Myrtle Beach and Turner Padget**, they must separate those communications, generate a sufficient privilege log, and produce the rest of their communications with Sullivan and Turner Padget. Moreover, the common interest doctrine that purportedly allowed the Arch Defendants, Turner Padget, Hall Booth Smith, the City of Myrtle Beach, and LBS to share information such as the focus group materials in the underlying case also allows the Arch Defendants to share those materials with LBS.

Finally, to the extent the Arch Defendants assert their own privilege or work product protections over any of the materials requested by Plaintiffs, their assertions fail. The materials requested by Plaintiffs were not prepared by the Arch Defendants in anticipation of litigation **against the Arch Defendants**. *See ContraVest Inc. v. Mt. Hawley Ins. Co.*, 273 F. Supp. 3d 607, 625 n.17 (D.S.C. 2017). To the extent they were prepared in anticipation of litigation, they were prepared in anticipation of litigation against LBS, and the Arch Defendants therefore cannot assert any work product protection. *Id.* Moreover, by raising affirmative defenses of good faith and advice of counsel as defenses, the Arch Defendants have placed their own privileged materials in issue in this case and have therefore waived any privilege. *See City of Myrtle Beach v. United Nat. Ins. Co.*, Civ. No. 4:08-1183, 2010 WL 3420044, at *5 (D.S.C. Aug. 27, 2010) (holding an insurer's privilege claim failed because the insurer had put its communications with counsel at issue by

15

asserting reasonableness and good faith in its answer to bad faith allegations); *ContraVest Inc. v. Mt. Hawley Ins. Co.*, No. 915CV00304DCNMGB, 2016 WL 11200705, at *8 (D.S.C. Dec. 12, 2016) ("[D]efendant denies having acted in bad faith. Thus, under *City of Myrtle Beach*, defendant has 'injected' issues of law and fact into this case that may be affected by information in the privileged documents."), *report and recommendation adopted*, 273 F. Supp. 3d 607 (D.S.C. 2017).

## II. The Arch Defendants' objections on grounds other than privilege are meritless.

In addition to the improper, blanket privilege assertions discussed above, the Arch Defendants raise meritless objections to several other discovery requests. Each objection is improper and inconsistent with the broad scope of discovery allowed by the federal rules. The Arch Defendants should be compelled to respond in full to each request.

### A. Interrogatories

The Arch Defendants object to two of Plaintiffs' interrogatories. They first object to Interrogatory 1 on the grounds that the terms "seniormost" and "chief operating decision makers" are vague and undefined. The term "chief operating decision makers" is the Arch Defendants' own term, which they used in filings with the U.S. Securities and Exchange Commission: "The Company's insurance, reinsurance and mortgage segments each have managers who are responsible for the overall profitability of their respective segments and who are directly accountable to the Company's **chief operating decision makers** . . . ." *See, e.g.*, Arch Capital Group, Ltd. 2022 Form 10-K at 111, **Exhibit H** (emphasis added). "Seniormost" is not a vague term. It should be interpreted according to its plain, commonly understood meaning—i.e., the highest-ranking insurance segment manager. A vagueness objection for the term "seniormost" is improper in any event; if the Arch Defendants believed the term may have more than one meaning, they should have sought clarification on the definition, then should have provided responsive

information.  *See Curtis v. Time Warner Ent.-Advance/Newhouse P'ship*, No. 3:12-CV-2370-JFA, 2013 WL 2099496, at *2 (D.S.C. May 14, 2013).

Moreover, in the context of the discovery completed so far, a request to identify the "seniormost insurance segment manager who was directly accountable to Defendants' chief operating decision makers with regard to the Wolde Claim" is not vague or confusing, and the Arch Defendants' identification of only Brian McMahon in response to Interrogatory 1 is insufficient. Kelli Sullivan's deposition testimony and text messages with McMahon make clear that McMahon was reporting to higher-ranking individuals within Arch during the underlying trial.  *See* McMahon Cell Phone Docs 043, 072, **Ex. B**; Sullivan Depo at 256:8–258:1, **Ex. F**.  The Arch Defendants are attempting to shield the identities of other key witnesses in this case.  They must be compelled to answer Interrogatory 1.

The Arch Defendants also object to Interrogatory 2—which requests the name of any entity with which any defendant shared any portion of the premiums paid by LBS for the indemnity coverage at issue in this case—on the grounds that it seeks irrelevant information and is not reasonably calculated to lead to the discovery of admissible evidence.  The objection is improper. The Arch Defendants have asserted in filings in this case that the three Arch Defendants are not amalgamated and should not be held jointly responsible for the bad faith alleged by Plaintiffs.  The sharing of premiums is relevant and reasonably calculated to discover evidence of the Arch Defendants'—and/or other legal entities'—individual and collective responsibility for administering the policy at issue and for the damages Plaintiffs suffered.  The scope of discovery is broad and includes any matter "that ***could bear on***, any issue that is or ***may be*** in the case." *Oppenheimer Fund*, 437 U.S. at 351 (emphases added).  Interrogatory 2 is consistent with this broad scope, and the Arch Defendants should be compelled to respond to the interrogatory.

B.   **Requests for Production**

The Arch Defendants object to several requests for production on grounds other than the privilege-related objections discussed above. They object to Requests 4, 5, and 9—which seek information related to reinsurance and loss reserves—on the grounds that the requests seek irrelevant information and are not reasonably calculated to lead to the discovery of admissible evidence. But relevance is a low bar. These requests are well within the broad scope of discovery and seek information that could bear on issues that are or may be in the case. *Oppenheimer Fund*, 437 U.S. at 351.

The reinsurance information sought in Requests 4 and 5 is relevant and discoverable. This case turns on the Arch Defendants' evaluation of the underlying claim and their decision not to accept the Estate's settlement demands or offer the policy limits. Their reinsurance agreements and correspondence will show how they valued and analyzed the underlying claims. Moreover, the reinsurance information is relevant to the Arch Defendants' decision never to offer the $3,000,000 policy limit because it may show their $1,000,000 settlement offer was motivated, in part, based on any reinsurance they purchased on the remaining $2,000,000 under the policy limits.

The information as to Defendants' loss reserves and loss adjustment expenses in the underlying case, sought in Request 9, is also relevant and discoverable. The Arch Defendants' determination of the amount of potential liability LBS faced is a critical issue in this case. Their setting of loss reserves and loss adjustment expenses is therefore relevant and probative of their bad faith in analyzing the potential exposure of their insured. *See Imperial Textiles Supplies Inc. v. Hartford Fire Ins. Co.*, No. 6:09-CV-03103-JMC, 2011 WL 1743751, at *4 (D.S.C. May 5, 2011) ("The fact that the insurance company established a reserve may be probative on the issue of whether there is a potential for liability in considering a third-party bad faith claim, and thus

reserve information may be relevant to the issue of bad faith."). The Court should therefore compel the Arch Defendants to produce the reserve-related information sought in Request 9.

### C. Other Objections

The Arch Defendants improperly attempt to limit the time period at issue in this case by asserting that Plaintiffs allege the Arch Defendants acted in bad faith only on April 13, 2022, and August 31, 2022, when they rejected settlement demands. Arch's rejections of the Estate's settlement demands were the ultimate manifestation of years of bad faith conduct. Plaintiffs have limited their requests to the period from the date the underlying claim arose through the end of the trial court proceedings in the underlying case. Arch's handling of the entire underlying claim is at issue in this case, and Arch cannot restrict the relevant time period to two days in 2022.

Further, Plaintiffs do not assert a legal malpractice claim. Plaintiffs are the masters of their complaint, and Arch cannot convert the claims asserted in this case into legal malpractice claims and then evade discovery based on its mischaracterization of Plaintiffs' claims.

### CONCLUSION

The Arch Defendants' discovery responses are an improper attempt to evade producing the relevant facts of this lawsuit. The Court should grant this motion and compel the Arch Defendants to serve complete responses to Plaintiffs' discovery requests and produce all the information sought by Plaintiffs.

*(Signature on Following Page)*

**McLeod Law Group, LLC**
3 Morris Street, Suite A
Charleston, SC 29403
Tel. 843-277-6657
Fax 843-277-6660

*s/ W. Mullins McLeod, Jr.*
W. Mullins McLeod, Jr.
H. Cooper Wilson, III

and

G. Murrell Smith, Jr.
Smith Robinson
126 N. Main Street
Sumter, SC 29151
Tel. 803-778-2471

Attorneys for the Plaintiffs

April 5, 2024
Charleston, South Carolina